1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   ROSEMARY HINOJOSA MULLINS as              No.  1:21-cv-00405-KES-SAB
     an individual, and as guardian ad litem for
12   K.A.M. (a minor),

13                      Plaintiffs,            ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'
14           v.                               MOTIONS FOR SUMMARY JUDGMENT

15   COUNTY OF FRESNO, CHRIS                  Docs. 50, 64
     CURTICE, ALEX RIORDAN,
16
                        Defendants.
17

18

19           This case concerns the shooting and death of Kenneth Mullins ("Mullins") on March 6,

20   2020.  Doc. 50.  The plaintiffs are Mullins's mother, Rosemary Mullins ("Rosemary Mullins"),

21   and his minor daughter and successor-in-interest, K.A.M.  Plaintiffs allege that Fresno County

22   Reserve Sheriff Deputies Chris Curtice and Alex Riordan used excessive force by shooting at

23   Mullins when he was unarmed, and they allege that the County of Fresno is liable based on its

24   failure to train, failure to discipline, and ratification of the officers' use of deadly force, and based

25   on its express policies and customs.  *See generally* Doc. 15.

26           Plaintiffs bring claims under state and federal law against defendants County of Fresno,

27   Curtice, and Riordan.  The action was removed to this Court on March 12, 2021, Doc. 1, and

28   proceeds on plaintiffs' second amended complaint ("SAC"), filed on December 3, 2021, Doc. 15,

                                            1

as twice amended by stipulation, on January 3, 2022, and October 7, 2024.  Docs. 19, 62.  Pursuant to 42 U.S.C. § 1983, plaintiffs allege a violation of their Fourteenth Amendment right to familial association and plaintiff K.A.M. alleges a violation of Mullins's Fourth Amendment right to be free from excessive force.  Plaintiffs also allege state law claims for battery, negligence, wrongful death, and violation of California Civil Code § 52.1 ("Bane Act").[1]

Defendants move for summary judgment on all claims.  Docs. 50, 64.[2]  Plaintiffs oppose both motions.  Docs. 56, 65.  The Court took the motions under submission.  Doc. 69.  For the reasons stated herein, defendants' motions are denied in part and granted in part.

## I.    Background

### A.  March 6, 2020

The record, viewed in the light most favorable to plaintiffs, shows the following.[3]  The owner of Jamie's Automobile Dismantling found Mullins sleeping inside the shop at approximately 5:00 p.m. on March 6, 2020.  Doc. 50-2, Joint Statement of Undisputed Material Facts ("JSUMF") No. 1.  The shop was closed for the day and no one else was present in the vicinity of the shop at the time.  *Id.*  The owner called the Fresno County Sheriff's Office ("FCSO") to report a trespasser, stating that he found Mullins asleep on the couch with a shotgun near him.  Doc. 63-2, Defendants' Separate Statement of Undisputed Material Facts, Plaintiffs' Response, and Defendants' Reply ("SSUMF") Nos. 1–2.

---

[1] Rosemary Mullins's claim for wrongful death was dismissed for lack of standing.  Doc. 14 at 14–15.  The wrongful death claim proceeds as to plaintiff K.A.M.  *Id.*

[2] Pursuant to the parties' stipulation, Doc. 62, all claims against Riordan were dismissed with exception of the § 1983 claim for excessive force in violation of the Fourth Amendment.

[3] Plaintiffs' oppositions, Docs. 56, 65, including the memoranda of points and authorities and the statements of undisputed material facts, contain multiple citations that (1) do not cite to the stated exhibit, (2) cite to a page number that does not exist in the referenced exhibit, or (3) do not include the cited language.  It is not this Court's task to "scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).  To the extent plaintiffs' citations are incorrect or unsupported, the Court deems the corresponding facts identified by the defendants as undisputed.

The FCSO dispatched several deputies to the scene. Doc. 56 at 9. Curtice and Riordan had just started their volunteer reserve shift together when Riordan received a call from another reserve deputy telling them that they may "need bodies." Doc. 56-4 at 10–11.[4] As Curtice and Riordan were on the way to the scene, Riordan read from the dispatch log on the computer. Doc. 56-11 at 35.[5] Details in the dispatch log included that Mullins had "broke[n] into the [business]" and was "currently in the office passed out," that there were "two shot guns in the office [with] [Mullins]," and that "[Mullins] took one of the guns out of the gun rack and place[d] it next to him." *Id.* at 127. The log later stated that the shotgun next to Mullins "ha[d] been put away." *Id.* at 128. The shotgun next to Mullins was not loaded; however, it is unclear whether Curtice or Riordan were informed of this fact at the scene. SSUMF No. 2.

Curtice and Riordan assert that they were told that Mullins had access to "other firearms" in the warehouse, in addition to the shotgun next to the couch where Mullins was sleeping. Doc. 56-4 at 52, 147. Curtice and Riordan state they never asked for clarification as to the "other firearms." *Id.* Curtice states that the source of such information was from the "call on the computer" and from Deputies Mehling and Obar. *Id.* However, the radio call stated that "there are two shotguns in the office with [Mullins]" and the computer call log stated that the reporting party stated that "there are two shot guns in the office with [Mullins]." Doc. 56-11 at 18, 127. To the extent defendant were relying on information from Mehling and Obar, the information those two officers had was also that Mullins had access to shotguns. Sergeant Adam Maldonado, who was one of the first to arrive on scene, stated that he informed Deputies O'Bar, Mehling, Sweany, Guzman, and Westbrook, that Mullins had access to shotguns, and that he assumed one of them would have informed Curtice and Riordan of that fact once they arrived on scene. Doc. 56-5 at

---

[4] Curtice had over 30 years' experience as a full-time deputy before becoming a level I reserve deputy in 2015. SSUMF No. 41. Riordan was a full-time deputy who had graduated from the academy and completed field training before becoming a level I reserve deputy in 2016. *Id.* No. 42.

[5] Defendants dispute what exactly from the call log Riordan read to Curtice and the extent of the defendants' knowledge when they arrived at the scene. Doc. 63-3, Plaintiffs' Additional Material Facts and Defendants' Response ("PAMF") No. 13.

43–44.  Sergeant Maldonado also corroborates that the dispatch log clearly stated "shotguns."  *Id.* at 44.  Riordan read at least part of the dispatch log to Curtice on their way to the scene.  Doc. 56-11 at 35.  These factual disputes present a triable issue as to whether Curtice and Riordan had any basis to believe Mullins had access to a firearm *other* than a shotgun, which informs whether a reasonable officer under the circumstances would have believed Mullins was armed when he exited the warehouse.

Shortly after Curtice and Riordan's arrival, another FCSO deputy used a patrol vehicle's public address speaker to order Mullins to come outside with his hands up, warning that if he did not do so, a dog would be sent into the warehouse and would bite him.  SSUMF No. 6.  Curtice retrieved his rifle from his patrol car and then met with other deputies on the scene.  Doc. 63-3, Plaintiffs' Additional Material Facts and Defendants' Response ("PAMF") No. 36.  Riordan was armed with a handgun.  Doc. 56-11 at 35.  Neither Curtice nor Riordan had less lethal weaponry.  PAMF No. 37.  Another deputy on scene, Robert Mehling, had a non-lethal rifle with him.  *Id.* No. 36.

Curtice and Riordan took position behind a black pickup truck about thirty yards from the west side of the warehouse.  Doc. 56-4 at 15, 25.  Curtice positioned himself by the driver's side next to the mirror, and Riordan at the right rear.  *Id.* at 15, 25, 79.  Officers made additional announcements to try to get Mullins to exit and deployed a robot to get a visual of Mullins inside the building.  SSUMF No. 8.  Mullins apparently disabled the robot after it entered the warehouse.  *Id.* No. 9.[6]

Thirty to sixty minutes after the initial speaker announcement ordering Mullins to exit the warehouse, Mullins exited the door at the west side of the warehouse, at which point the sun had set, and it was dark.  *Id.* Nos. 11–12.[7]  Mullins was wearing a black button up football jacket.  *Id.*

---

[6] It is unclear exactly how the robot became disabled, including whether Mullins picked up and threw the robot and/or kicked it.  SSUMF No. 9.

[7] The Court grants defendants' unopposed request for judicial notice of the fact that, on March 6, 2020, in Fresno, California, the sun set at approximately 5:59 p.m.  Doc. 50-7; *see* Fed. R. Evid. 201(b) (The court may take judicial notice of facts that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources

4

1    No. 13.  Mullins made eye contact with Curtice after he came out of the warehouse, before

2    turning southward and walking away from Curtice and Riordan with his back to them.  *Id.* No. 14.

3    As Mullins walked away, his hands were by his side.  *Id.* No. 15.  Officer Zachary Westbrook,

4    observing the scene from about fifty yards away, described Mullins's walk as "kinda meandering

5    off."  Doc. 56-5 at 154–55; PAMF No. 57.  Curtice, Riordan, and Westbrook do not report seeing

6    a shotgun or any other weapon on Mullins when Mullins initially exited the building.  Curtice and

7    Riordan identified themselves as FCSO deputies and gave Mullins commands to "show us your

8    hands," "take your hands out of your pockets," and "stop."  SSUMF No. 16.  Mullins looked back

9    over his right shoulder towards Curtice and Riordan, then continued walking away with his back

10   to them.  Doc. 56-4 at 24; SSUMF No. 17.  Curtice and Riordan then left their cover behind the

11   pickup truck and moved out to a dirt roadway, walking towards Mullins.  SSUMF No. 17.

12   Neither Curtice nor Riordan ever warned Mullins that they would use deadly force if he did not

13   comply with their orders.  PAMF No. 61.

14          As Mullins continued to walk away with his back to them, the deputies reiterated the same

15   commands to Mullins.  SSUMF No. 18.  While walking away with his back to Curtice and

16   Riordan, Mullins suddenly stopped, turned to his right, faced Curtice and Riordan, and raised his

17   hands out at about chest height.  SSUMF Nos. 19–20; Doc. 50-4 at 72–73.[8]  At this point,

18   Riordan yelled "gun, gun, gun."  SSUMF No. 22.  Riordan moved off to the right behind some

19   vehicles for cover.  *Id.* No. 23.  Curtice fired one shot from his rifle that missed Mullins.  *Id.* No.

20   25.  Curtice states he was momentarily blinded by the muzzle flash and the dust kicked up in the

21   _____

22   whose accuracy cannot reasonably be questioned.").

23   [8] This account is largely based on the statements of Officer Westbrook, who in his interview with
     FCSO detectives shortly after the incident said he could "see [Mullins] perfectly."  Doc. 56-5 at
24   154.  Defendants assert that, in addition to commanding Mullins to show his hands, take his
     hands out of his pockets, and stop, they also instructed him to "get on the ground."  SSUMF No.
25   18.  And defendants characterize Mullins's movements as forming a "shooting stance," crouching
     and aiming what appeared to be a gun at them, rather than simply raising his hands up.  *Id.* No.
26   20.  A reasonable jury could find that Westbrook's observations do not corroborate all of
     defendants' contentions.  *See* Doc. 56-5 at 140–61; Ex. 11 at 25:20–25:50.  Among other
27   discrepancies, Westbrook does not recount having heard an order for Mullins to get on the
     ground.
28

                                                   5

air. *Id.* No. 27. Approximately twenty to twenty-five seconds passed between the time Mullins came out of the building and Curtice's firing his first shot. *Id.* No. 30. In describing the interaction in his deposition, Curtice stated that "everything happen[ed] [] all at the same time. It was all so fast." Doc. 50-4 at 78. When asked if he pulled the trigger because Riordan said "gun, gun, gun," Curtice said "no" and stated that, in that moment, he would have shot at Mullins even if he had not heard Riordan say "gun, gun, gun." *Id.*

Mullins then turned back around and continued to walk away from the defendants with his hands by his sides. SSUMF No. 31. Curtice did not return to cover and continued to give Mullins commands to "show his hands" and to "take his hands out of his pockets." Doc. 56-4 at 68–70; SSUMF No. 32. Approximately three to five seconds after Curtice fired the first shot, Mullins turned around toward the deputies a second time and again made the same motion raising his hands up. SSUMF Nos. 33, 37. Both deputies then shot at Mullins. *Id.* Nos. 34–36. Curtice fired four shots from his rifle, and Riordan fired five shots from his handgun. JSUMF Nos. 8–9. Mullins was struck by two bullets, one on the left side of his forehead above his left eyebrow, and one on the inner side of his right thigh. SSUMF No. 36; Doc. 56-11 at 37. Curtice fired the two bullets that struck Mullins. PAMF No. 67. The five bullets fired by Riordan mostly hit cars providing his cover. *Id.* No. 68. Mullins died from his injuries. Mullins did not have a firearm on him. Doc. 56-11 at 37.

**B. FCSO Training and Policies**

At the time of the incident, the FCSO provided annual training on the use of deadly force. SSUMF Nos. 38–40. Curtice and Riordan attended this training in May 2018 and March 2019. *Id.* No. 40. Reserves also attend the Annual Reserve Deputy Peace Officer Conference ("ARPOC") in August of every year. *Id.* No. 43. Curtice and Riordan attended this conference every year except 2020, when it was cancelled due to the Covid pandemic. *Id.* The FCSO Use of Force Policy (Policy 300) in effect at the time of the incident stated that (1) deputies shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose and (2) a deputy may use deadly force to protect himself or others from what he

1   reasonably believes would be an imminent threat of death or serious bodily injury.  *Id.* Nos. 44–

2   45.

3        The FCSO Reserve Deputies policy (Policy 326) set forth the requirements, duties, and

4   training required for reserve deputies.  *Id.* No. 46.  The policy stated that reserve deputies assist

5   full-time deputies in the enforcement of laws and in maintaining peace and order within the

6   community, and that their assignments would usually be to augment the Patrol Bureau.  *Id.*

7   Policy 326 also required that reserve deputies comply with all firearms training.  *Id.* No. 43.

8   Reserve deputies were required to adhere to the policies of the FCSO, and any policy that applied

9   to a full-time deputy similarly applied to a reserve deputy, unless inapplicable by its nature.  *Id.*

10  No. 47.

11  **II.    <u>Legal Standard</u>**

12       Summary judgment is appropriate if "there is no genuine dispute as to any material fact

13  and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

14  "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

16  of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in

17  the record."  Fed. R. Civ. P. 56(c)(1).  The Court then views the record in the light most favorable

18  to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

19  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  However, the nonmoving party's

20  version of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v.*

21  *City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary

22  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23  genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

24       "A party seeking summary judgment bears the initial burden of informing the court of the

25  basis for its motion and of identifying those portions of the pleadings and discovery responses

26  that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless,*

27  *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

28  (1986)).  If "the moving party will have the burden of proof on an issue at trial, the movant must

7

1   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

2   party." *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he

3   moving defendant bears the burden of proof on the issue of qualified immunity.").

4       If the moving party meets its initial burden, the burden shifts to the nonmoving party to

5   produce evidence supporting its claims or defenses and "establish that there is a genuine issue of

6   material fact." *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply

7   show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).

8   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

9   insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

10      In the endeavor to establish the existence of a factual dispute, the nonmoving party need

11  not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec.*

12  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual

13  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

14  trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

15  253, 289 (1968)).  However, "[w]hen opposing parties tell two different stories, one of which is

16  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

17  adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*

18  *v. Harris*, 550 U.S. 372, 380 (2007).

19      "If the nonmoving party fails to produce enough evidence to create a genuine issue of

20  material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

21  party produces enough evidence to create a genuine issue of material fact, the nonmoving party

22  defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

23  1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

24  **III.    Discussion and Analysis**

25      Plaintiffs assert that Curtice and Riordan deprived Mullins of his Fourth Amendment right

26  to be free from excessive force, and deprived plaintiffs of their Fourteenth Amendment right to

27  familial association.  Plaintiffs also assert the County of Fresno is subject to *Monell* liability for

28  an express policy, a custom or practice, and a failure to train, that led to the fatal shooting of

1  Mullins, and because it ratified the officer defendants' actions.  Plaintiffs also bring ancillary state

2  law claims of battery, negligence, wrongful death, and violation of the Bane Act.  Defendants

3  move for summary judgment on each of plaintiffs' claims.  This Order examines each claim in

4  turn.  Before turning to the merits of these arguments, however, the Court addresses defendants'

5  evidentiary objections.

6      **A. Evidentiary Objections**

7      Defendants raise objections to the evidence cited in opposition to the motion for summary

8  judgment.  *See generally* Docs. 63, 68.  The objections are "garden variety evidentiary

9  objections" such as relevancy, hearsay, foundation, and speculation.  *See Torres v. Los Angeles*

10  *Sheriff's Dept.*, No. CV 22-07450-MWF (MARx), 2024 WL 4720808, at *5 (C.D. Cal. Aug. 14,

11  2024).

12      "[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's

13  form.  We instead focus on the admissibility of its contents."  *Sandoval v. County of San Diego*,

14  985 F.3d 657, 666 (9th Cir. 2021).  That is, though such objections could prove cognizable at

15  trial, only the admissibility of the relevant facts at trial, not the form of these facts as presented in

16  the motion, matters for purposes of a motion for summary judgment.  *See id.*  Where "the

17  contents of a document can be presented in a form that would be admissible at trial—for example,

18  through live testimony by the author of the document—the mere fact that the document itself

19  might be excludable hearsay provides no basis for refusing to consider it on summary judgment."

20  *Id.* (citations omitted).

21      To the extent that the Court relies upon evidence to which a party objects in deciding the

22  motion for summary judgment, the objections are overruled.  To the extent the Court does not, the

23  objections are denied as moot.[9]

24  ///

25  ///

26

27  [9] Defendants also object to plaintiffs' expert report, Doc. 56-7, Ex. 18, under Federal Rule of
   Evidence 702.  Doc. 63-1 at 13.  As the Court need not rely on plaintiffs' expert for the analysis

28  below, it is not necessary to address defendants' Rule 702 objection in this Order.

1   **B. Section 1983 Claims**

2       To succeed on a § 1983 claim, plaintiffs must demonstrate (1) "that a right secured by the

3   Constitution or laws of the United States was violated," and (2) "that the alleged violation was

4   committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442

5   F.3d 1178, 1185 (9th Cir. 2006).  Defendants do not dispute that Curtice and Riordan's actions

6   were under color of state law.

7       Defendants primarily argue that Curtice and Riordan's actions did not result in the

8   deprivation of Mullins's Fourth Amendment right to be free from excessive force and that

9   defendants are entitled to qualified immunity.  Doc. 50 at 12.  Because whether the officer's

10  conduct violated a constitutional right is a component of the qualified immunity analysis, the

11  Court proceeds directly to consideration of qualified immunity.

12      Qualified immunity shields "government officials 'from liability for civil damages insofar

13  as their conduct does not violate clearly established statutory or constitutional rights of which a

14  reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting

15  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "balances two important interests

16  – the need to hold public officials accountable when they exercise power irresponsibly and the

17  need to shield officials from harassment, distraction, and liability when they perform their duties

18  reasonably." *Id.*  An officer may be denied qualified immunity only if "(1) the [evidence], taken

19  in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated

20  a constitutional right, and (2) the right at issue was clearly established at the time of the incident

21  such that a reasonable officer would have understood her conduct to be unlawful in that

22  situation." *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting *Torres v. City

23  of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  Courts are "permitted to exercise their sound

24  discretion in deciding which of the two prongs of the qualified immunity analysis should be

25  addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at

26  236.  The Court first addresses whether defendants violated plaintiffs' constitutional rights.

27  ///

28  ///

1          **1. Fourth Amendment Claim**

2                  **i.   Deputy Curtice**

3                      **a.   Constitutional Violation**

4          In determining whether Curtice used excessive force, the "use of force to effect an arrest"

5  is examined "in light of the Fourth Amendment's prohibitions on unreasonable searches and

6  seizures," and it is "measured by the standard of objective reasonableness." *Deorle v. Rutherford*,

7  272 F.3d 1272, 1279 (9th Cir. 2001).  This standard requires courts to decide "whether the totality

8  of the circumstances justified a particular" use of force.  *Nelson v. City of Davis*, 685 F.3d 867,

9  878 (9th Cir. 2012) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).  The Ninth Circuit

10 has held that "summary judgment should be granted sparingly in excessive force cases."

11 *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (citing *Glenn v. Washington*

12 *County*, 673 F.3d 864, 871 (9th Cir. 2011)).

13         Relevant factors in "assessing whether an officer's use of force was objectively reasonable

14 include 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety

15 of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest

16 by flight.'"  *Gonzalez*, 747 F.3d at 793 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

17 "The immediacy of the threat posed by the suspect is the most important factor."  *Id.* (citing

18 *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  "These factors are not

19 exclusive, and we consider the totality of the circumstances."  *Gonzalez*, 747 F.3d at 793–94

20 (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  The Court recognizes that

21 "police officers are forced to make split-second judgments—in circumstances that are tense,

22 uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

23 situation." *Graham*, 490 U.S. at 396–97.  Accordingly, the Court evaluates these factors from the

24 perspective of the officers at the time of the incident, without the benefit of 20/20 hindsight.  *See*

25 *Gonzalez*, 747 F.3d at 794.

26         At the same time, "'[a]n officer's use of deadly force is reasonable only if 'the officer has

27 probable cause to believe that the suspect poses a significant threat of death or serious physical

28 injury to the officer or others.'"  *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis

11

1    omitted) (quoting *Garner*, 471 U.S. at 3).  "The factors that justify the use of force must be

2    weighed against the degree of intrusion posed by the particular type of force to determine if the

3    use in the particular instance was reasonable."  *Nelson*, 685 F.3d at 883.  Here, the "nature and

4    quality of the intrusion" by Curtice on Mullins's Fourth Amendment interests were "extreme."

5    *See A. K. H. ex rel Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (citing

6    *Garner*, 471 U.S. at 8).  "The intrusiveness of a seizure by a means of deadly force is

7    unmatched."  *Garner*, 471 U.S. at 9.  "The use of deadly force implicates the highest level of

8    Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life'

9    and because such force 'frustrates the interest of the individual and of society, in judicial

10   determination of guilt and punishment.'"  *A. K. H.*, 837 F.3d at 1011.

11          As to the "severity of the crime" at issue, the Ninth Circuit applies this factor in "two

12   slightly different ways."  *Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019).  First, when

13   "all other things [are] equal," use of force is more reasonable "when applied against a felony

14   suspect than when applied against a person suspected only of a misdemeanor."  *Id.*  Second, the

15   severity of the crime may serve "as a proxy for the danger a suspect pose[d] at the time force is

16   applied," even though "the danger a suspect [posed] is a separate *Graham* consideration."  *Id.*  In

17   this case, the parties disagree as to the classification of Mullins's crime as a trespass or burglary.

18   Doc. 56 at 21; Doc. 50 at 9.  A trespass, a non-violent misdemeanor, would warrant less force

19   than a burglary, "considered to carry an inherent risk of violence."  *Sandoval v. Las Vegas Metro.*

20   *Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014).  Regardless, even construing the crime as a

21   trespass, Curtice and Riordan were informed on their way to the scene that Mullins had nearby

22   access to shotguns.  Doc. 56-11 at 127.  It was reasonable for the officers to have prepared for a

23   potentially violent encounter with Mullins when they arrived on the scene.  However, as

24   addressed below, no officer reports seeing Mullins with a shotgun when he exited the building.

25          The next, and most important factor, the immediacy of the threat posed to the safety of the

26   officers, weighs in favor of plaintiffs.  Here, there is no video footage, bodycam or otherwise, of

27   this incident.  "Deadly force cases pose a particularly difficult problem . . . because the officer

28   defendant is often the only surviving eyewitness."  *Henrich*, 39 F.3d at 915.  This Court "must

1    ensure that the officer is not taking advantage of the fact that the witness most likely to contradict

2    his story—the person shot dead—is unable to testify." *Id.* Accordingly, the Court "carefully

3    examine[s] all the evidence in the record . . . to determine whether the officer's story is internally

4    consistent and consistent with other known facts." *Gonzalez*, 747 F.3d at 795 (quoting *Henrich*,

5    39 F.3d at 915). The Court "also examine[s] circumstantial evidence that, if believed, would tend

6    to discredit the police officer's story." *Id.*

7         While Mullins's actions leading up to the incident provide context as to the potential

8    threat Curtice and Riordan perceived, the most critical circumstances are the officers' instructions

9    to Mullins, and Mullins's movements, in the short time between when Mullins exited the building

10   and the officers shot him. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014)

11   (focusing analysis on alleged threatening gesture which triggered officer's decision to shoot).

12   Defendants claim that Mullins suddenly turned to his right, faced the officers, and got into a

13   shooting stance, pointing what Curtice and Riordan perceived to be a gun in their direction.

14   SSUMF No. 20. However, Officer Westbrook observed Mullins turning around and raising his

15   hands straight up to about chest height, and he does not describe Mullins as forming a shooting

16   stance or aiming his hands at the deputies as if he were firing a weapon. *See* Doc. 56, Ex. 11 at

17   25:20–25:50. While Curtice and Riordan claim they told Mullins to "get on the ground," Officer

18   Westbrook, who observed the incident, does not report hearing such a command.

19        After Mullins turned around, Curtice and Riordan state that Riordan yelled "gun, gun,

20   gun." SSUMF No. 22. However, Curtice confirms that Riordan's yell did not prompt him to fire

21   his rifle, and he would have shot anyway. Doc. 50-4 at 78. Curtice then fired one shot from his

22   rifle that missed Mullins. SSUMF No. 25. Curtice and Riordan assert that they did not know at

23   that time whether Mullins also shot at them. *Id.* No. 26. Plaintiffs contest this characterization,

24   arguing that neither officer reports seeing a gun flash from Mullins (it is undisputed that Mullins

25   was unarmed, though defendants dispute knowing this at the time). *Id.* Mullins then turned his

26   back to the officers and continued to walk in a southward direction while Curtice and Riordan

27   repeated commands for Mullins to stop and show his hands. *Id.* No. 32. Westbrook understood

28   the officers' commands to be asking for Mullins to turn around. Doc. 56-5 at 178. Mullins then

1    turned around to his right a second time and raised his hands up to about chest height.  SSUMF

2    No. 33.  At this point, both Curtice and Riordan fired their weapons at Mullins.  *Id.* Nos. 34–36.

3    Mullins was struck by two bullets, one on the left side of his forehead above his left eyebrow, and

4    one on the inner side of his right thigh.  Doc. 56-11 at 37.

5         Two central factual disputes create a triable issue regarding the immediacy of the threat.

6    The first is whether Mullins quickly turned around, formed a "shooting stance," and pointed his

7    hands towards Curtice, or if he instead turned around and raised his hands to the officers as they

8    were instructing him to do.  A reasonable jury might credit defendants' account and conclude that

9    Mullins made rapid, threatening movements in the dark that constituted a serious threat to the

10   officers.  *See Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023), *cert denied*,

11   144 S. Ct. 559 (2024) ("[W]here the person is armed—or reasonably suspected of being armed—

12   a furtive movement, harrowing gesture, or serious verbal threat might create an immediate

13   threat.") (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).  Alternatively, a

14   reasonable jury could find that Mullins was turning around in a nonthreatening attempt to comply

15   with the officers' commands to stop and show his hands, and that shooting him was an

16   unreasonable use of force.

17        Moreover, when considering "circumstantial evidence that, if believed, would tend to

18   discredit the police officer's story," *Gonzalez*, 747 F.3d at 795, it is undisputed that Mullins did

19   not have a gun on him.  Defendants' claim that Mullins swiftly turned, formed a shooting stance,

20   and pointed his hands at them in a manner akin to firing a weapon, may give a reasonable jury

21   pause given that Mullins did not, in fact, have any such weapon.[10]  Furthermore, Westbrook

22   describes Mullins as turning and raising his hands to chest level, not getting into a "shooting

23   stance" or looking like he was "firing a weapon."  The jury might find the officers' account

24   credible, or it might find that the circumstantial evidence, coupled with Westbrook's

25   observations, undermine the officers' account.  *See Cruz*, 765 F.3d at 1079–80 (circumstantial

26   evidence that decedent did not have a gun on him could give a reasonable jury pause, where

27   ───────────────

28   [10] *See* Doc. 56-4 at 74 (Curtice acknowledging that he found out afterwards that Mullins was unarmed).

officer claimed decedent reached in his waistband as if for a gun).  Construing all inferences in favor of the plaintiffs, and given Officer Westbrook's testimony, a reasonable jury could find that Mullins did not form a "shooting stance," but, rather, complied with the deputies' commands to turn around and show his hands.  SSUMF Nos. 19–20.

The second key factual dispute is whether the defendants had a reasonable basis to believe Mullins was armed when he came out of the warehouse.  The defendants were told Mullins had a shotgun in the building, but there is no indication that defendants, or any other officer, observed Mullins with a shotgun when he exited the building.  While Curtice and Riordan claim that they were also told that Mullins had access to "firearms" in the warehouse, Doc. 56-4 at 52, 147, the radio traffic, dispatch log, and other officers on the scene only reference Mullins having access to "shotguns," as noted above.  It is undisputed that Mullins did not have any firearm on him when he was shot.  It is for the jury to determine whether the defendants could have reasonably believed that Mullins might have been concealing a shotgun or another firearm when he exited the building.

Another factor is whether Mullins resisted.  Here, Mullins was not fleeing quickly from the scene, but was slowly walking away from Curtice and Riordan, with his back to them, when they ordered him to stop and show his hands.  SSUMF No. 19.  The Ninth Circuit draws a distinction between passive and active resistance.  *Bryan*, 630 F.3d at 830.  Resistance is not "a binary state," but rather, "runs the gamut from the purely passive protestor who simply refuses to stand [at an officer's command], to the individual who physically assault[s] [an] officer." *Id.* "Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.*  Mullins's conduct arguably constituted only passive resistance.  The Ninth Circuit has held on numerous occasions that "a failure to . . . immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F.3d at 881.  Despite this passive resistance, the officers used deadly force, the maximum amount of force possible.  This factor also weighs in favor of

1    plaintiffs.

2    Other relevant factors in the balancing include "the availability of less intrusive force" and

3    "whether proper warnings were given." *Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2016),

4    *cert. granted, rev'd on other grounds*, 584 U.S. 100 (2018).  Regarding the availability of less

5    intrusive force, Curtice and Riordan had positioned themselves behind a vehicle before Mullins

6    exited the warehouse.  Doc. 56-4 at 18.  The officers left that cover to walk after Mullins when he

7    started walking away from them, and they ordered Mullins to stop and show his hands, which a

8    reasonable jury could find Mullins then did in an attempt to comply with the officers' orders.  *See*

9    SSUMF Nos. 17–18.[12]  While defendants claim they ordered Mullins to get on the ground,

10   Westbrook does not recount hearing such a command.  There is therefore arguably a material

11   dispute of fact as to whether defendants gave a command to get on the ground, which could have

12   lessened the need for any use of force had Mullins complied with it.  *See Bryan*, 630 F.3d at 831

13   (finding that, while not dispositive, fact that officer did not consider less intrusive means by

14   adapting to "change [in] tactical calculus confronting him" factored into *Graham* analysis).

15   Additionally, it is undisputed that defendants failed to warn Mullins that he would be shot

16   if he did not comply with their orders.  PAMF No. 61.  Curtice had his flashlight and weapon

17   trained on Mullins while Mullins was walking away, and Curtice gave multiple commands to

18   Mullins.  SSUMF Nos. 15–16.  It was feasible to give a warning that such force would be used if

19   Mullins did not immediately comply.  This failure to warn weighs in favor of plaintiffs.  *Bryan*,

20   630 F.3d at 831 ("[P]olice officers normally provide [] warnings where feasible, even when the

21   force is less than deadly, and that failure to give such a warning is a factor to consider.").  While

22   such a warning to Mullins "may or may not have caused him to comply, there was ample time to

23   give that order or warning and no reason whatsoever not to do so."  *Id.* (citing *Deorle*, 272 F.3d at

24   1284).

25   Another relevant factor considers "whether the officers were or should have been aware

26

27   _____

     [12] Mullins argues that Deputy Mehling could have offered Curtice his less-lethal rifle.  PAMF
     Nos. 36–37.  However, no evidence suggests that Curtice knew Mehling had his less-lethal rifle,
28   nor that Curtice was trained to use it.

that [Mullins] was emotionally disturbed." *Glenn*, 673 F.3d at 875. Here, Curtice and Riordan were informed that there was a man asleep on the couch at the warehouse. Doc. 56-4 at 79, 173. When Mullins did not cooperate with the initial commands from the patrol car speaker to exit the warehouse, Curtice suspected Mullins could be potentially "on drugs," and thought of Mullins as not a "normal criminal." Doc. 56-4 at 22–24. A reasonable jury could find that, given Curtice and Riordan's experience, Mullins's abnormal behavior might have given rise to an inference that he was emotionally disturbed. And "[e]ven when an emotionally disturbed individual is acting out and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Glenn*, 673 F.3d at 876 (quoting *Deorle*, 272 F.3d at 1283).

In *Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017), the Ninth Circuit considered a similar situation. There, the suspect, Longoria, led officers on a car chase lasting more than forty minutes. *Longoria*, 873 F.3d at 702. After Longoria exhibited erratic behavior, such as making a gun with his fingers and pointing his fingers at his head, officers disabled Longoria's car. *Id.* at 703. Longoria got out of his vehicle and stood nearby, facing the officers with one hand behind his back. *Id.* Longoria did not initially comply with commands to show his hands. *Id.* The Sergeant on scene ordered the officers to use less lethal force. *Id.* The defendant took up a position between "25 to 45 feet to Longoria's right." *Id.* Other officers fired beanbag rounds and tased Longoria, after which he flinched and moved erratically. *Id.* Longoria then "turned halfway around to his right—towards and past [the defendant]—to face his car and put his empty hands up above his head, his back to the officers and [the defendant]. The defendant fired two rounds from his assault rifle into Longoria's back, killing him." *Id.* at 703. Longoria was not armed with a weapon. *Id.* at 705. In reversing the district court's grant of summary judgment, the Ninth Circuit stated that "[t]he most important question in this case is whether [the defendant] reasonably perceived that Longoria assumed a threatening or 'shooter's stance.' 'If [he] did, [he] w[as] entitled to shoot; if [he] didn't, [he] [was]n't.'" *Id.* at 706–07 (quoting *Cruz*, 765 F.3d at 1079). The court found that the defendant's claim that Longoria turned his hands in a way that

17

1  mimicked a "shooter's stance" was disputed, and therefore the defendant's "credibility or the

2  accuracy of his version of the facts is a central question that must be answered by a jury." *Id.* at

3  705.

4        Considering the totality of the *Graham* factors, it is for the jury to determine whether

5  Curtice used excessive force against Mullins, who was unarmed, when Mullins stopped, turned

6  toward the officers, and raised his hands.  Curtice and Riordan allege that Mullins formed a

7  threatening shooting stance, but there is a genuine dispute of fact as to whether Mullins did so.

8  *See, e.g.,* Doc. 56-5 at 155–56 (Westbrook describing, in an interview with detectives several

9  hours after the incident, Mullins's movements as raising his hands up straight to about chest

10  height).  There are triable issues of material fact that preclude finding on summary judgment that

11  the decision to shoot was objectively reasonable.  The jury must decide those factual issues to

12  determine if the use of deadly force, an extreme act reserved for exceptional circumstances, was

13  disproportionate to any perceived threat posed by Mullins.  Viewing the evidence in the light

14  most favorable to plaintiffs, a jury could find that Curtice and Riordan shot at Mullins while he

15  was following the officers' commands to stop and show his hands.  In such circumstances, the use

16  of lethal force would constitute excessive force in violation of the Fourth Amendment.  *See*

17  *Johnson v. Myers*, 129 F.4th 1189, 1194 (9th Cir. 2025) (affirming denial of summary judgment

18  based on qualified immunity when officers shot and killed man who could have been complying

19  with commands to put his hands up when he was shot).

20        **b.  Clearly Established Law**

21        The Court must next decide if it was "clearly established at the time of the violation" that

22  the use of deadly force in such circumstances was a constitutional violation.  *Espinosa v. City &*

23  *County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194,

24  201 (2001)).  To determine whether a defendant violated clearly established law, we look to

25  "cases relevant to the situation [the officer] confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 200

26  (2004).  "The law is clearly established when precedent is 'clear enough that every reasonable

27  official would interpret it to establish the particular rule the plaintiff seeks to apply.'"  *Calonge*,

28  104 F.4th at 47 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  "Although '[the

1   Supreme] Court's caselaw does not require a case directly on point for a right to be clearly

2   established, existing precedent must have placed the statutory or constitutional question beyond

3   debate.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–

4   79 (2017)).  The "general rules" from *Garner* and *Graham* "do not by themselves create clearly

5   established law outside an 'obvious case.'"  *Id.* at 105.  "Because we are making a determination

6   at summary judgment, we must view any disputed facts in the light most favorable to [Mullins]."

7   *Longoria*, 873 F.3d at 709.

8         While certain of the relevant facts are in dispute, viewing the facts in the light most

9   favorable to plaintiffs, Mullins, when unarmed, turned to face the officers in an effort to comply

10   with their commands that he stop and show his hands.  In March 2020, the law governing this

11   case was clear: Mullins's "Fourth Amendment right not to be shot dead while unarmed,

12   surrounded by law enforcement, and in the process of surrendering is clearly established, such

13   that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he

14   confronted.'" *Longoria*, 873 F.3d at 710 (quoting *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017)).

15   Accordingly, Curtice's motion for summary judgment as to plaintiffs' Fourth Amendment claim

16   is denied.

17             **ii.  Deputy Riordan**

18             **a.  Constitutional Violation**

19         Defendants also move for summary judgment as to plaintiffs' Fourth Amendment claim

20   against Riordan.  Doc. 64.  As addressed above with respect to the motion as to Curtice, it is for

21   the jury to determine whether Riordan's decision to fire his weapon at Mullins was reasonable

22   under the totality of the circumstances.  A key distinction between Riordan and Curtice is that the

23   bullets Riordan fired were not the ones that hit Mullins.  PAMF No. 67.[13]  Riordan argues that, as

24   _____

25   [13] Plaintiffs urge the Court to accept their later contention, made in the opposition to defendants'
second motion for summary judgment, which addresses the claim against Riordan, that it is

26   unclear whose bullets struck Mullins.  However, in their opposition to defendants' first motion for
summary judgment, which addresses most of plaintiffs' claims, plaintiffs contend that "Curtice

27   shoots and kills Mullins with a rifle shot to the head and another bullet to the leg." PAMF No. 67.
The Court construes this contention as a judicial admission.  *See Am. Title Ins. Co. v. Lacelaw*

28   *Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Siam Numhong Prods. Co. v. Eastimpex*, 866 F. Supp.

1    he did not cause Mullins's injuries or death, he cannot be liable under § 1983.  Doc. 64 at 19.

2          Riordan's argument is unpersuasive.  A section 1983 claim for excessive force need not be

3    premised on the plaintiff proving an actual injury.  *See Hazle v. Crofoot*, 727 F.3d 983, 991 n.6

4    (9th Cir. 2013) ("[N]ominal damages must be awarded in cases in which the plaintiff is not

5    entitled to compensatory damages, such as cases in which no actual injury is incurred or can be

6    proven.").  In other words, if a reasonable jury could find Riordan's use of force was excessive

7    under the totality of the circumstances, the fact that Riordan's shots did not result in Mullins's

8    death would not preclude Riordan from being held liable for the constitutional violation.  For the

9    reasons explained above, a reasonable jury could determine that Riordan shot at Mullins when

10   Mullins was submitting to the officers' authority and was turning around and raising his hands up

11   to comply with their commands.

12         Additionally, a "police officer need not have been the sole party responsible for a

13   constitutional violation before liability may attach. An officer's liability under section 1983 is

14   predicated on his integral participation in the alleged violation."  *Nicholson v. City of Los*

15   *Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (internal quotations omitted).  Here, viewing the

16   evidence in the light most favorable to plaintiffs, Riordan was "more than a mere bystander in the

17   alleged constitutional violations."  *Id.* at 692.  Riordan was issuing commands along with Curtice

18   for Mullins to stop and turn around.  SSUMF No. 18.  Riordan also screamed "gun, gun, gun,"

19   when Mullins first turned around.  *Id.* No. 22.  Riordan then fired his weapon at Mullins when

20   Mullins turned around a second time.  PAMF No. 68.  Accordingly, a reasonable jury could find

21   that Riordan either individually committed a constitutional violation when he shot at Mullins, or

22   that he was an integral participant in the violation.  *See Boyd v. Benton County*, 374 F.3d 773, 780

23   (9th Cir. 2004) (holding that officers who provided armed backup for another officer who

24   unconstitutionally deployed a flash-bang device to gain entry to suspect's home could be liable

25   for that use of excessive force because "every officer participated in some meaningful way" in the

26   _____

27   445, 450 (N.D. Cal. 1994) ("A judicial admission may be contained in a statement of undisputed
     facts, an answer, a bill of particulars or any other pleading, or it may be contained in testimony
     such as a deposition.").  In any event, as addressed above, summary judgment is properly denied

28   as to Riordan even assuming that his shots did not strike Mullins.

20

1    arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and

2    participated in the search operation knowing the flashbang was to be deployed").

3                              **b.  Clearly Established Law**

4            Qualified immunity depends on the alleged constitutional violation the officer committed,

5    not necessarily the resulting injury.  *See Pearson*, 555 U.S. at 231 (2009) (discussing rationale for

6    qualified immunity as a shield from liability for certain *conduct* by government officials).

7    Viewing the evidence in the light most favorable to plaintiffs, Riordan yelled commands at

8    Mullins to stop and show his hands, and Riordan then shot at him when Mullins complied by

9    turning around and raising his hands.  A reasonable jury could find that Riordan used excessive

10   force to subdue Mullins.  Riordan was on notice that such conduct would be a constitutional

11   violation.[14]  As with Curtice, Mullins's "Fourth Amendment right not to be shot dead while

12   unarmed, surrounded by law enforcement, and in the process of surrendering [was] clearly

13   established, such that it 'would be clear to a reasonable officer that his conduct was unlawful in

14   the situation he confronted.'"  *Longoria*, 873 F.3d at 710.

15                          **2.  Fourteenth Amendment Claim**

16                              **i.  Constitutional Violation**

17           Defendants also move for summary judgment on plaintiffs' claim that Curtice violated

18   plaintiffs' substantive due process right to familial association under the Fourteenth Amendment.

19   "To prevail on a substantive due process claim under the Fourteenth Amendment, plaintiffs must

20   show that an officer's conduct 'shocks the conscience.'"  *Nicholson*, 935 F.3d at 692.  The

21   "critical consideration [is] whether the circumstances are such that actual deliberation is practical.

22

23   [14] Defendants argue that, in plaintiffs' opposition, Doc. 65, plaintiffs did not acknowledge
     defendants' qualified immunity argument as to Riordan and therefore did not satisfy plaintiffs'
24   "burden of showing that the rights allegedly violated were 'clearly established.'"  *Shafer v.
     County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (citing *LSO, Ltd. v. Stroh*, 205
25   F.3d 1146, 1157 (9th Cir. 2000)).  However, plaintiffs' opposition argues that both Curtice and
     Riordan should be denied qualified immunity based on clearly established law.  Doc. 56 at 24
26   (arguing disputed facts that bear on "whether the *officers* used reasonable force in seizing Mullins
     . . . [which] also bar entry of summary judgment on qualified immunity . . .").  The Court
27   construes the opposition as opposing defendants' qualified immunity defense as to both Curtice
     and Riordan.
28

                                              21

1    If so, an officer's 'deliberate indifference' may suffice to shock the conscience, and the plaintiff

2    may prevail by showing that the officer disregarded a known or obvious consequence of his

3    action." *Id.* at 692–93.  If deliberation is impractical under the circumstances, "where a law

4    enforcement officer makes a snap judgment because of an escalating situation, his conduct may

5    only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate

6    law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

7        Here, Curtice had his rifle trained on Mullins for twenty to twenty-five seconds before

8    Mullins turned around for the first time.  SSUMF Nos. 15, 30.  Curtice issued repeated commands

9    to Mullins to "show his hands" and "stop," and a reasonable jury could find that Mullins was

10    complying with those commands—stopping and showing his hands to the officers—when Curtice

11    shot him.  Whether Mullins got into a shooting stance is a disputed factual issue.  It is undisputed

12    that there was a significant law enforcement presence surrounding Mullins, with substantial time

13    elapsing between Curtice's arrival and the shooting, and that the officers did not give any warning

14    that lethal force would be used.  In these circumstances, a reasonable jury could find that actual

15    deliberation was practical, and in that case the deliberate indifference standard would apply. *See*

16    *Nicholson*, 935 F.3d at 693–94 (finding deliberate indifference standard applied where officer

17    saw what he believed to be a gun and, without communicating with his partner, seeking cover, or

18    otherwise formulating a plan with other officers, shot the individual).[15]   Under this standard, a

19    reasonable jury could conclude that Curtice acted with deliberate indifference when he shot

20    Mullins.

21    ///

22    ///

23    _____

24    [15] In *Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022), the Ninth Circuit held that the more stringent purpose-to-harm standard can apply even where "the officer may have helped to create an

25    emergency situation by his own excessive actions."  *Peck*, 51 F.4th at 894.  However, in *Peck*, it was undisputed that the suspect threatened to shoot the officers and that the officers observed a

26    firearm within reaching distance of him.  *Id.* at 883–84.  Here, viewing the facts in the light most favorable to plaintiffs, a jury could find that Curtice did not have a reasonable basis to believe

27    Mullins was armed when he exited the warehouse, that Curtice left available cover, that Curtice ordered Mullins to turn around by commanding him to stop and show his hands, and that Mullins

28    was attempting to comply with that order when Curtice shot him.

1          **ii.  Clearly Established Law**

2          Even if a constitutional violation occurred, qualified immunity nevertheless applies unless

3   the violation was clearly established.  The Ninth Circuit has held that "a Fourteenth Amendment

4   claim of excessive force 'must be governed by a different standard than' a Fourth Amendment

5   claim of excessive force" and that "Fourth Amendment cases cannot clearly establish the contours

6   of the Fourteenth Amendment right, despite similarities between the standards."  *Nicholson*, 935

7   F.3d at 696 n.5.  Therefore, a defense of qualified immunity is defeated only if there was clearly

8   established law, with sufficient factual particularity, confirming plaintiffs' Fourteenth

9   Amendment right.  *See Kisela*, 584 U.S. at 104.

10         The Ninth Circuit's decision in *Nicholson* put Curtice on notice that firing a weapon at

11  someone whom the officer mistakenly believes may be holding a gun, when the person is "not

12  engaged in any threatening or menacing behavior," disregards a known or obvious consequence

13  of an action, and deprives that person of their Fourteenth Amendment rights.  *Nicholson*, 935 F.3d

14  at 693.  In *Nicholson*, observing what he believed to be a gun in the hands of someone attempting

15  to rob or shoot another, the officer ran towards the perceived perpetrator and, without warning,

16  fired at the individual, striking a bystander close by.  *Id.* at 689.  The perceived perpetrator was in

17  fact holding a toy gun.  *Id.*  Noting that, other than the officer's belief that the perceived

18  perpetrator was holding a gun, no attendant circumstances weighed in favor of the immediate use

19  of deadly force, the court found that the officer's failure to communicate with his partner, failure

20  to seek cover, and failure to formulate a plan before acting, all supported the finding that the

21  officer acted with deliberate indifference in violation of the Fourteenth Amendment.  *Id.* at 695.

22  The court also held that "in 'minimal information' situations, an officer must take some time to

23  assess what is happening before employing deadly force.  Holding otherwise would result in an

24  'intolerably high risk of a tragic shooting that may otherwise have been avoided by proper

25  deliberation whenever practical.'"  *Id.* at 694–95.

26         A reasonable jury could find that Mullins was complying with the officers' commands to

27  stop and turn around, and did not get into a shooting stances, and that Curtice had sufficient time

28  to further assess the situation, as in *Nicholson*.  Accordingly, Curtice is not entitled to qualified

23

1  immunity on plaintiffs' Fourteenth Amendment claim, and defendants' motion for summary

2  judgment as to that claim is denied.

3  **3.  *Monell* Claim**

4  The County of Fresno moves for summary judgment as to plaintiffs' claim for municipal

5  liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  "A

6  government entity may not be liable under § 1983 unless a policy, practice, or custom of the

7  entity can be shown to be a moving force behind a violation of constitutional rights."  *Dougherty*

8  *v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).  "In order to

9  establish a liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the

10  plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had

11  a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional

12  right; and (4) that the policy is the moving force behind the constitutional violation.'"  *Id.* at 900.

13  Plaintiffs argue *Monell* liability under four principal theories:  (1) the County's express

14  policies detailing the duties of volunteer "reserve" officers, like Curtice and Riordan, were ill-

15  suited to prepare them for potentially deadly encounters; (2) the County's longstanding customs

16  or practices allowed for potentially deadly situations to arise between unprepared officers and

17  individuals; (3) the County failed to adequately train reserve deputies by using outdated use of

18  force policies, failing to train on de-escalation, and failing to have Curtice and Riordan complete

19  training until September 2020, months after the incident; and (4) the County ratified the

20  unconstitutional use of deadly force given the Fresno Sheriff's comments before and after the

21  incident.  Doc. 56 at 17–19.

22  As a threshold matter, the Court considers whether the officer defendants violated the

23  Fourth and Fourteenth Amendments when they used deadly force against Mullins.  *See*

24  *Dougherty*, 654 F.3d at 900.  As explained above, viewing the evidence in the light most

25  favorable to plaintiffs, a jury could find that Curtice and Riordan violated both plaintiffs' Fourth

26  and Fourteenth Amendment rights.  This predicate element is therefore established.  The Court

27  next addresses each of plaintiffs' theories of *Monell* liability.

28

1              **i.    Express Policy**

2              Plaintiffs argue that the decision to deploy reserves, such as Curtice and Riordan, to a

3      potentially dangerous engagement, despite the responsibilities laid out in the reserves policy

4      limiting them to "assist on call, assist primary deputies, [and] assist after the fact," PAMF No. 77,

5      suggests that the County's deficient policy "assumes volunteers won't be overwhelmed by the

6      stress of a [deadly situation]." Doc. 56 at 17.[16]

7              Plaintiffs' argument is unpersuasive.  To find liability for an express policy, there must be

8      a policy that is the moving force of the violation in question.  *See Dougherty*, 654 F.3d at 900.

9      FCSO Policy 326 governs reserve deputies and establishes that their role is to "supplement and

10     assist regular sworn sheriff deputies in their duties."  Doc. 50-5 at 14.  The policy thereby limits

11     reserve deputies to primarily assisting regular deputies, which reduces the likelihood of reserve

12     deputies being the primary officers in significant encounters.  There is no such "express policy"

13     that plaintiffs point to that led to a potential constitutional violation.  The County cannot be liable

14     under its express policy, when that policy does not affirmatively direct reserve deputies to take

15     primary responsibility in a potentially deadly situation.  *See Fogel v. Collins*, 531 F.3d 824, 834

16     (9th Cir. 2008) (defining policy for purposes of *Monell* liability as a "deliberate choice to follow a

17     course of action.").

18             Plaintiffs also argue that the use-of-force policy in effect at the time of the incident,

19     Policy 300, did not include de-escalation provisions, which were eventually incorporated into the

20     2022 iteration of Policy 300.  Doc. 56 at 18.  Plaintiffs argue that the County purposefully omitted

21     de-escalation provisions from its policy because, despite peer police departments incorporating

22     de-escalation provisions in their respective use of force policies by early 2020, the County refused

23     to do so.  *Id.*  Therefore, plaintiffs contend that the County had an express policy not to engage in

24     _____

25     [16] In support of their argument, plaintiffs cite to *Lowry v. City of San Diego*, 818 F.3d 840 (9th Cir. 2016), *on reh'g en banc*, 858 F.3d 1248 (9th Cir. 2017).  *See* Doc. 56 at 27–28.  In its initial decision

26     in *Lowry*, the court considered an official "bite-and-hold" policy allowing police dogs to bite and hold suspects and found that the policy was the moving force of an excessive force violation.

27     *Lowry*, 818 F.3d at 854–55.  However, that opinion was subsequently withdrawn.  On rehearing en banc, the Ninth Circuit did not consider *Monell* liability for the City's "bite-and-hold" policy, after

28     finding that the plaintiff did not suffer a constitutional injury.  *Lowry*, 858 F.3d at 1260.

1  de-escalation tactics.  *Id.*  However, Policy 300, while not explicitly including a de-escalation

2  section, provided factors for officers to consider in determining the reasonableness of the use of

3  force, including the availability of other reasonable and feasible options and their possible

4  effectiveness.  Doc. 56-9, Ex. 21.  Policy 300.4 also identified requirements for the use of deadly

5  force.  *Id.*, Ex. 22.  Therefore, while the County later incorporated specific de-escalation policies

6  as required by state law, the County's policies in effect at the time of the incident addressed the

7  reasonableness of the use of force, addressed the use of deadly force, and included de-escalation

8  techniques.  Plaintiffs fail to establish that the County had an express policy against using de-

9  escalation techniques.  Accordingly, plaintiffs' *Monell* theory based on an express policy fails.

10                   **ii.    Custom or Practice**

11          Plaintiffs' theory based on a custom or practice fares no better.  It is unclear what custom

12  plaintiffs allege, and plaintiffs fail to show a "longstanding practice or custom which constitutes

13  the standard operating procedure of the local government entity."  *Trevino v. Gates*, 99 F.3d 911,

14  918 (9th Cir. 1996).  "Liability for improper custom may not be predicated on isolated or sporadic

15  incidents."  *Id*; *see also Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989)

16  (dismissing *Monell* "custom" allegation where plaintiff failed to produce evidence of "widespread

17  abuses or practices . . . [which ] are so pervasive as to have the force of law"); *Meehan v. County*

18  *of Los Angeles*, 856 F.2d 102 (9th Cir. 1988) (two incidents not sufficient to establish custom).

19          A custom or practice can be "supported by evidence of repeated constitutional violations

20  which went uninvestigated and for which the errant municipal officers went unpunished."  *Hunter*

21  *v. County of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011).  But plaintiffs do not set forth any

22  evidence of repeated incidences outside of the one involving Mullins.  *See Benavidez v. County of*

23  *San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021) ("[G]enerally, a single instance of unlawful

24  conduct is insufficient to state a claim for municipal liability under section 1983").  Moreover,

25  plaintiffs admit that there were no officer-involved shootings involving FSCO reserve deputies

26  prior to March 6, 2020.  SSUMF No. 52.  Therefore, plaintiffs' *Monell* theory based on a custom

27  or practice fails.

28

1                               **iii. Failure to Train**

2         Plaintiffs contend that the County failed to adequately train Curtice and Riordan.

3 "[F]ailure to train may constitute a basis for *Monell* liability where the failure amounts to

4 deliberate indifference to the rights of those who deal with municipal employees." *Benavidez*,

5 993 F.3d at 1153 (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). Deliberate

6 indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a

7 known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,

8 520 U.S. 397, 410 (1997). To show deliberate indifference, plaintiffs must show that the need

9 "'for more or different' action 'is so obvious, and the inadequacy [of existing practice is] so likely

10 to result in the violation of constitutional rights, that the policymakers of the city can reasonably

11 be said to have been deliberately indifferent to the need.'" *Hyun Ju Park v. City and County of*

12 *Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020).

13         Plaintiffs argue that reserve deputies were not required to attend substantive training on

14 the use of force until September 2020, after the incident in March 2020. However, while Curtice

15 and Riordan did not complete their 2020 training until September 2020, following the incident,

16 the evidence shows that they did receive training on the use of deadly force in May 2018 and

17 March 2019. Doc. 56-11 at 171–72. Curtice and Riordan also received training on deadly force

18 during the Annual Reserve Deputy Peace Officer Conference every August until 2020, when the

19 conference was cancelled due to the Covid pandemic. *Id.* Policy 300 confirms that the County

20 required such training, stating that officers must receive "periodic training on this policy and

21 demonstrate their knowledge and understanding." Doc. 50-5 at 12. Policy 326, specific to

22 reserve deputies, also required reserves to comply with all areas of the firearms training section of

23 the Policy Manual. *Id.* at 17. Therefore, the evidence presented refutes plaintiffs' contention that

24 Curtice and Riordan were not trained on the use of deadly force prior to the incident.[17]

---

[17] Plaintiffs also argue that the officers did not receive training on interacting with the homeless
population or those with mental illness, but they fail to establish how any such training would
have affected their interaction with Mullins in this case. While Mullins's mental state and
condition may have played a role in this incident, a party alleging a failure to train violation must
show that, but for the lack of that policy, the violation likely would not have occurred. *See*
*Benavidez*, 993 F.3d at 1153–54. Plaintiffs do not make any such showing.

1    In sum, there is no evidence to suggest that there was any inadequate training likely to

2    result in a constitutional violation.  Therefore, plaintiffs' *Monell* failure to train theory fails as

3    well.

4                                **iv.  Ratification**

5    While plaintiffs do not explicitly make a ratification argument in their opposition to

6    defendants' motion, they allege the Fresno Sheriff at the time showed "ongoing hostility to the

7    concept of de-escalation" and opposed proposed legislative reform on the use of force.  Doc. 56 at

8    26.  Plaintiffs attach and cite news articles referencing comments by the Sheriff.  *See generally*

9    Doc. 56-11.

10    "A municipality may be held liable for a constitutional violation if a final policymaker

11    ratifies a subordinate's actions.  To show ratification, a plaintiff must show that the 'authorized

12    policymakers approve a subordinate's decision and the basis for it.'"  *Lytle v. Carl*, 382 F.3d 978,

13    987 (9th Cir. 2004) (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)).  Here,

14    plaintiffs attach evidence of the Sheriff's comments on proposed legislative changes to use of

15    force policies and de-escalation tactics in general.  Doc. 56-11 at 51–52, 57.  Specifically, in April

16    2018, the Sheriff stated: "What they're trying to do is legislate to the exception.  That's a problem

17    when you do that."  *Id.*  Three months following the incident, in June 2020, the Sheriff was

18    quoted saying that "[i]t's a continuum where you react based on the force being used against you

19    and so I think that's important that we don't create a ladder where you have to go from one step

20    to the next because situations unfold very quickly."  *Id.* at 57.

21    These comments cannot serve as a basis for liability under ratification or any other *Monell*

22    theory.  Regarding the April 2018 comments, there is no evidence to suggest that the Sheriff's

23    generalized criticism of proposed legislation on the use of force was a ratification of

24    unconstitutional actions.  And the June 2020 comments do not constitute an approval of Curtice

25    and Riordan's actions in March 2020 sufficient to invoke liability.  *See Lytle*, 382 F.3d at 987

26    ("The policymaker must have knowledge of the constitutional violation and actually approve it.

27    A mere failure to overrule a subordinate's actions, without more, is insufficient to support a

28

1  § 1983 claim.").  Accordingly, plaintiffs' ratification theory fails.

2         No reasonable jury could find that the County failed to adequately train the officers or had

3  an express policy or a custom or practice that was the moving force behind the asserted

4  constitutional violations against plaintiffs on March 6, 2020, or that the County ratified the

5  officers' conduct.  Therefore, the defendants' motion for summary judgment is granted as to

6  plaintiffs' *Monell* claim.[18]

7         **C.  State Law Claims**

8         In addition to their section 1983 claims, plaintiffs bring state law claims for battery,

9  negligence, wrongful death, and violation of the Bane Act against both the County and Curtice.

10  Although section 1983 limits municipality liability to policies, customs, failures to train, and

11  ratification, "California has rejected the *Monell* rule and instead imposes liability on public

12  entities for state law causes of action under the doctrine of respondeat superior."  *Knapps v. City*

13  *of Oakland*, 647 F. Supp. 2d 1129, 1165 (N.D. Cal. 2009) (citing Cal. Gov't. Code § 815.2(a)).

14  Thus, for each of the claims listed below, to the extent the motion is denied as to Curtice, the

15  motion as to the County is also denied.  *See Jaramillo v. City of San Mateo*, 76 F. Supp. 3d 905,

16  925 (N.D. Cal. 2014).

17         **1.  Battery**

18         "State law claims for battery are coextensive with claims for excessive force under the

19  Fourth Amendment."  *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1177 (E.D. Cal. 2016);

20  *see also Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008), *aff'd* 340 Fed.

21  Appx. 377 (9th Cir. 2009).  As plaintiffs' cause of action for battery is "the counterpart of the

22  federal claim for excessive force," *Garlick*, 167 F. Supp. 3d at 1177, and there is a triable issue as

23  to Curtice's liability under the Fourth Amendment, defendants' motion for summary judgment as

24  _____

25  [18] In the SAC, plaintiffs also argued *Monell* liability under a failure to discipline theory.  SAC at 10.  However, plaintiffs do not set forth any evidence of a failure to discipline or otherwise raise

26  this theory in their opposition to the motion for summary judgment.  Accordingly, the Court considers this argument to be abandoned.  *See Momox-Caselis v. Donohue*, 987 F.3d 835, 842

27  (9th Cir. 2021) (deeming arguments not raised in opposition to summary judgment motion waived); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001) (holding that

28  district court need only consider arguments and facts set forth in motion papers).

1    to the battery claim is denied. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A

2    state law battery claim is a counterpart to a federal claim of excessive use of force. In both a

3    plaintiff must prove that the peace officer's use of force was unreasonable.").

### 2. Negligence

5        To show negligence, plaintiffs must establish "(1) a legal duty to use due care; (2) a

6    breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps*, 647

7    F. Supp. 2d at 1164 (citing *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996)). Under

8    California law, "police officers have a duty not to use excessive force." *Id.* (citing *Munoz v. City*

9    *of Union City*, 120 Cal. App. 4th 1077, 1101 (2004) (recognizing "a duty on the part of police

10   officers to use reasonable care in deciding to use and in fact using deadly force.").

11       "California's negligence law is 'broader than federal Fourth Amendment law,' in that,

12   '[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force

13   are relevant considerations under California law in determining whether the use of deadly force

14   gives rise to negligence liability.'" *Garlick*, 167 F. Supp. 3d at 1178. Because there is a triable

15   issue as to whether Curtice's decision to use deadly force against Mullins was reasonable under

16   the totality of the circumstances, defendants' motion for summary judgment as to plaintiffs'

17   negligence claim is denied.

### 3. Wrongful Death

19       Plaintiffs also bring a claim for wrongful death under Cal. Civ. Proc. Code § 377.60,

20   "which is simply the statutorily created right of an heir to recover for damages resulting from a

21   tortious act which results in the decedent's death." *Gilmore v. Superior Court*, 230 Cal. App. 3d

22   416, 420 (1991). "The elements of the cause of action for wrongful death are the tort (negligence

23   or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss

24   suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006). The

25   California Supreme Court has held that "an officer's lack of due care can give rise to negligence

26   liability for the intentional shooting death of a suspect." *Morales v. City of Delano*, 852 F. Supp.

27   2d 1253, 1278 (E.D. Cal. 2012) (quoting *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979)). Because

28   there is a triable issue as to whether Curtice was negligent in his decision to use deadly force

1    against Mullins, defendants' motion for summary judgment as to plaintiffs' wrongful death claim

2    is also denied. *See id.* ("[T]he tort claims for wrongful death and negligence are connected for

3    purposes of the present motion for summary judgment.").

### 4. Bane Act

5         The Bane Act, Civil Code section 52.1(b), provides a cause of action where a person

6    "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or

7    coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the

8    Constitution or laws of the United States." Cal. Civ. Code § 52.1(b). The Bane Act requires a

9    "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v.*

10   *County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). "[A] reckless disregard for a

11   person's constitutional rights is evidence of a specific intent to deprive that person of those

12   rights." *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993). Consistent with the analysis of

13   plaintiffs' Fourth and Fourteenth Amendment claims, there is a triable issue as to whether Curtice

14   acted with reckless disregard when he fired his weapon at Mullins. Accordingly, defendants'

15   motion for summary judgment as to plaintiffs' Bane Act claim is denied.

### D. Punitive Damages

17        In a section 1983 action, punitive damages may be awarded when a "defendant's conduct

18   was driven by evil motive or intent, or when it involved a reckless or callous indifference to the

19   constitutional rights of others." *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993).

20   Section 1983 punitive damages "can also be awarded to address 'malicious, wanton, or

21   oppressive acts or omissions.'" *Knapps*, 647 F. Supp. 2d at 1171 (citing *Dang v. Cross*, 422 F.3d

22   800, 807 (9th Cir. 2005)). Conduct is oppressive "if done in a manner which injures or damages

23   or otherwise violates the rights of another person with unnecessary harshness or severity as by

24   misuse or abuse of authority or power, or by taking advantage of some weakness or disability or

25   the misfortunes of another person." *Dang*, 422 F.3d at 809.

26        Under the facts viewed in the light most favorable to plaintiffs, a reasonable jury could

27   find that Curtice acted with reckless or callous indifference to plaintiffs' constitutional rights

28   when he used deadly force against Mullins. Accordingly, the jury could potentially find that

1     plaintiffs are entitled to punitive damages against Curtice.[19]

2 **IV.**    **Conclusion and Order**

3     Accordingly:

4    1.  Defendants' motions for summary judgment, Doc. 50, 64, are GRANTED IN PART

5       and DENIED IN PART, as follows:

6         a.  DENIED as to the Fourth Amendment excessive force claim against Deputy

7           Curtice;

8         b.  DENIED as to the Fourth Amendment excessive force claim against Deputy

9           Riordan;

10         c.  DENIED as to the Fourteenth Amendment familial deprivation claim against

11           Deputy Curtice;

12         d.  DENIED as to the state law claims for battery, negligence, wrongful death, and

13           the Bane Act against Deputy Curtice and the County of Fresno;

14         e.  DENIED as to the punitive damages claim against Deputy Curtice; and

15         f.  GRANTED as to the *Monell* claim against the County of Fresno.

18 IT IS SO ORDERED.

19    Dated:   July 26, 2025

20                           UNITED STATES DISTRICT JUDGE

---

28  [19] Plaintiffs are not seeking punitive damages against Riordan. Doc. 56 at 23.